HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
MEGAN T. HOPKINS, CA Bar #294141
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone: (916) 498-5700
Fax: (916) 498-5710

Attorneys for Defendant
MARCUS LAWRENCE WEBER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MARCUS LAWRENCE WEBER,<br><br>    Defendant. | Case No. 2:22-cr-0069-JAM<br><br>MARCUS LAWRENCE WEBER'S FORMAL OBJECTIONS TO PRESENTENCE REPORT; MOTION TO CORRECT PRESENTENCE REPORT<br><br>Date:  August 30, 2022<br>Time:  9:30 a.m.<br>Judge: Hon. John A. Mendez |

For the reasons specified below, and any others that may arise during his sentencing hearing, defendant Marcus Lawrence Weber hereby objects to the Presentence Report ("PSR") in his case, and moves to correct it.

DATED: August 16, 2022                    Respectfully submitted,

                            HEATHER E. WILLIAMS
                            Federal Defender

                            /s/ *Megan T. Hopkins*
                            MEGAN T. HOPKINS
                            Assistant Federal Defender
                            Counsel for Defendant
                            MARCUS LAWRENCE WEBER

## I. OBJECTION TO THE GUIDELINES CALCULATION

The Presentence Report ("PSR") calculates a total offense level of 21, improperly applying a base offense level of 22 under USSG §2K2.1(a)(3) and a +2 level adjustment for reckless endangerment during flight under USSG §3C1.2, neither of which are applicable to the facts of this case. Mr. Weber therefore objects to the base offense level and USSG §3C1.2 enhancement and moves this Court to correct the base offense level to 20 (pursuant to USSG §2K2.1(a)(4)(A)) and total offense level to 17, with a corresponding guideline range of 37-46 months.

**A. Mr. Weber Did Not Have a Firearm with an "Large Capacity Magazine" as Required for Application of USSG §2K2.1(a)(3)**

The definition of a "large capacity magazine" is found at Application Note 2 to USSG § 2K2.1. It is not defined in the guideline itself. That application note defines "large capacity magazine" as, "a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm." This definition should not be afforded deference by this Court based on recent Supreme Court case law and the enhancement to Mr. Weber's base offense level should not apply.

The Supreme Court has previously held that guideline commentary is to be treated as an agency's interpretation of its own regulation. *Stinson v. United States*, 508 U.S. 36, 44 (1993). The Supreme Court most recently established a test for the Court to use in its independent inquiry as to whether an "agency reading" of a rule should be given deference. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2417 (2019) (narrowly affirming the doctrine of Auer deference regarding a VA regulation). The Court held that deference to an agency's interpretation of a rule or regulation is limited to cases in which 1) the rule or regulation is ambiguous; and 2) the interpretation is reasonable. *Id*.

Following *Kisor*, in *United States v. Nasir*, the Third Circuit acknowledged that it "may

have gone too far in affording deference to the guidelines' commentary under the standard set forth in *Stinson*." 17 F. 4th 459 (3d Cir. 2021). The *Nasir* court remanded a case for resentencing upon holding that the USSG § 4B1.2(b) career offender guideline did not apply, because inchoate crimes are not included in the definition of "controlled substance offenses" despite guideline commentary that appears to expand the definition. In a concurring opinion joined by five judges in *Nasir*, Judge Bibas emphasized: "Old precedents that turned to the commentary rather than the text no longer hold." Id. at 472. Under *Kisor,* with regard to USSG § 2K2.1(a)(3) no deference is due the "15-round" threshold for "Large Capacity Magazine" because the interpretation fails scrutiny at each step of the analysis set forth by the Supreme Court.

   1. *"Large Capacity Magazine" is Not Ambiguous*

The Supreme Court now instructs courts to "exhaust all the 'traditional tools' of construction" to determine whether a regulation is ambiguous, and to "carefully consider the text, structure, history, and purpose of a regulation" to resolve ambiguities before deferring to an agency's reading of a regulation. *Kisor*, 139 S.Ct. 2400 at 2415. Here, the term "large capacity magazine" (also commonly referred to as an "extended clip") is *not* ambiguous. A large capacity magazine (or "extended clip") is necessarily larger (capable of storing more rounds) than the *standard* magazine, which varies based on the type of firearm and the manufacturer of the firearm and therefore requires a fact-specific inquiry.

Information about the standard magazines manufactured for each style of firearm is readily available through the manufacturers, and has been the subject of much scholarly research and publication for the past several decades. It is a straightforward task to determine the standard magazine for any specific type of firearm, and from there it is equally straightforward to discern whether a specific magazine is larger than the standard. There is little room for ambiguity in this regulation. However, even if the Court determines that "genuine ambiguity remains … the agency's reading must still be 'reasonable.' In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id*. at 2415–16.

   2. *The Interpretation of "Large Capacity Magazine" in the Guideline Commentary is Unreasonable, and Must Be Fact-Specific to the Relevant Firearm*

The interpretation of a "large capacity magazine" as any magazine with a capacity greater than 15 rounds is not reasonable given that a wide range of firearms, including the most commonly possessed firearms nationwide, are manufactured with a standard magazine capable of accepting more than 15 rounds. Magazines capable of accepting more than 15 rounds of ammunition are commonly used in most handguns, which the Supreme Court acknowledged are the "quintessential self-defense weapon" in the United States. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) (overruled *en banc*, with facts undisputed) (*quoting District of Columbia v. Heller*, 554 U.S. 570, 629, (2008)). For example, "Smith & Wesson (S&W) M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and other S&W variants have similar capacities. The Ruger SR9 has a 17-round standard magazine. The Ruger SR9 and SR40 carry 17 rounds. Springfield Arms XD non-subcompact pistols hold up to 19 rounds." *Id.* at FN 4. Several variants of the Glock pistol, one of the most popular handguns nationwide such that it has been deemed "America's Gun", come standard with a 17-round magazine.[1] The Ruger 5.7, which is the firearm involved in the instant offense, has a 20-round standard magazine.[2]

Given the wide variation in firearms and the corresponding industry standards the commentary definition reaches absurd results in many cases and therefore is a "bright-line rule [that] cannot be considered a reasonable interpretation of—as opposed to an improper expansion beyond— [the guideline]'s text." *United States v. Riccardi*, 989 F.3d 476, 480 (6th Cir. 2021) (Reversing defendant's sentence for theft of gift cards because district court improperly applied a bright line rule set for in the commentary to USSG §2B1.1 that a $500 loss amount applied for every card defendant stole, regardless of the actual loss amount). In order to avoid absurd results

---

[1] *See* Glock, Inc, https://us.glock.com/en/pistols/g17 (Last visited on August 15, 2022) ("...optimal magazine capacity of 17 rounds in the standard magazine…"); *see also* Paul M. Barrett, Glock: The Rise of America's Gun (2012); *Proposals to Reduce Gun Violence: Protecting our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 113th Cong. 13-14 (2013) (statement of Laurence H. Tribe, Carl M. Loeb University Professor, Harvard Law School) (discussing the Glock).

[2] *See* Ruger, Inc., https://ruger.com/products/ruger57/models.html (Last visited on August 15, 2022) ("Capacity: 20+1").

WEBER – Formal Objections to PSR

due to improper expansion of a straightforward guideline, the Court must not apply the application note and should instead make a fact-specific determination in each case as to what firearms are involved, what standard capacity magazine is manufactured for the firearm(s), and whether the magazine attached or in close proximity to the firearm was larger than the standard capacity magazine.

Post-*Kisor*, "one tool among many stands out as well suited to the task [of statutory interpretation]: the rule of lenity. As we rework the Sentencing Guidelines cases, lenity is the tool for the job." *Nasir*, 17 F.4th at 472 (Bibas, J. concurring). The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008). The rule of lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate…" *Dunn v. United States*, 442 U.S. 100, 112 (1979). Here, should the court determine that sufficient ambiguity exists to turn to the reasonableness of the guideline commentary, the rule of lenity is the primary lens through which the court should conduct its analysis. Lenity in this case demands a rejection of the 15-round threshold, which does not comport with the manufacturing of standard magazines for most firearms in the present day and requires speculation as to whether the standard magazine that comes with a given firearm exposes one to significantly harsher sentencing penalties than called for in the plain text of the guideline.

3. *Mr. Weber Did Not Possess a Large Capacity Magazine*

Here, Mr. Weber possessed a Ruger 5.7 pistol with a *standard* 20-round magazine containing 11 rounds of ammunition. PSR at ¶ 13. He did not have a magazine with a larger capacity than the manufacturer's standard magazine, and therefore should not be subject to a two-level increase of the base offense level. Accordingly, the base offense level for the instant offense should be 20, pursuant to USSG § 2K2.1(a)(4)(A).

**B. Mr. Weber Did Not Recklessly Create a Substantial Risk of Serious Bodily Injury to Another Person During Flight**

Section 3C1.2 applies where a "defendant *recklessly* created a *substantial risk of death or serious bodily injury* or another person in the course of fleeing from a law enforcement officer."

(emphasis added).  The guideline provides that "reckless" is defined as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, Application Note 1.[3] The California Vehicle Code §23103(a) defines "Reckless Driving" as "driv[ing] a vehicle with willful or wanton disregard for the safety of people or property."  The Government bears the burden of proving factors enhancing a sentence. *See United States v. Restrepo*, 946 F.2d 654, 661 (9th Cir. 1991) (en banc), *cert. denied*, 118 L. Ed. 2d 211, 112 S. Ct. 1564 (1992).

      Here, the government cannot meet its burden.  Mr. Weber did not drive recklessly.  His speed was only slightly in excess of the posted limit in the apartment complex's lot, and his total "flight" in the vehicle was limited to 30 seconds. PSR at ¶ 10.  He did not come close to striking another vehicle or person during the 30 seconds he drove the vehicle after law enforcement directed him to stop.  He placed the vehicle in "park" before exiting to continue his flight on foot.

      Mr. Weber's brief flight on foot was similarly neither reckless nor did it create a substantial risk of death or serious bodily injury to others.  His flight was instinctive, both as someone unlawfully possessing a firearm, suddenly pursued by police, and given the well-established history of abusive and often deadly force used by law enforcement on people of color.  To the extent he was unreasonable in carrying a firearm (concealed in his pants) in close proximity to families that might be disturbed in seeing a firearm in public or police in pursuit of a suspect, as the probation officer concludes, that conduct at its worst can be described as negligence. The enhancement does not apply to negligent conduct. More to the point, causing a disturbance by having a firearm in public does not equate to creating "substantial risk of injury or death."

      The Ninth Circuit has determined that "instinctive flight on foot from law enforcement is insufficient on its own to justify the application of section 3C1.2." *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483, (9th Cir. 1997).  Instead, application of the two-level

---

[3] For purposes of § 3C1.2, "reckless" is defined in the Commentary to section 2A1.4. U.S.S.G. § 3C1.2, Application Note 2.

enhancement under this section is typically limited to barricaded standoffs, high-speed chases, physical struggles with the police while in possession of a loaded firearm, and particularly egregious circumstances of flight with loaded weapons requiring counteraction with public safety measures.  *See e.g., United States v. Campbell*, 42 F.3d 1199 (9th Cir. 1994) (twelve hour police standoff involving seventy law enforcement officers and violent threats); *United States v. Andrade-Garcia*, 1999 U.S. App. LEXIS 32691 (9th Cir. 1999) (70 m.p.h. chase on the interstate with five undocumented immigrants lying unsecured in the back of a truck); *United States v. Miller*, 39 Fed. Appx. 517 (9th Cir. 2002) (flight into a playground with a loaded shotgun and handgun, knowing that the police had their guns drawn, and thus compelling the police to order all the children and teachers to the ground in concern for their safety).  Not every attempt to escape law enforcement escalates to reckless endangerment of others, even for those armed during their flight.  While the court may draw inferences from the summary of flight conduct, "the inferences are not conclusive" and it is for this reason that an "enhancement under section 3C1.2 requires the district court to engage in a fact specific inquiry."  *United States v. Young*, 33 F.3d 31 (9th Cir. 1994).

      In this case, Mr. Weber was in possession of a loaded firearm at the time law enforcement sought to apprehend him pursuant to an unrelated warrant.  He elected to run, briefly, rather than submit to arrest.  He could have left the firearm in the vehicle with his passenger and fled without it, but that would have created a separate risk to the officers seeking to detain the passenger and could have exposed the passenger to criminal liability.  Instead, Mr. Weber kept the firearm with him during flight, concealed in his pants while he fled, and ensuring that firearm was rendered "safe" during his flight[4] and was not left abandoned where bystanders, including families with children, would have access to it.  When, at one point, he nearly dropped the firearm while running, he stopped to ensure it was secure before continuing to flee.  He did not physically struggle with law enforcement and surrendered, disarming himself beforehand, when continued flight became impractical.

---

[4] The Ruger 5.7 handgun is designed with a dual-safety feature including a thumb safety lever which automatically decocks the pistol and a firing mechanism safety on the trigger preventing accidental fire and drop-fire. Both safety mechanisms were engaged during Mr. Weber's flight from law enforcement.

Mr. Weber had no reason to believe that his instinctual flight from the police, nor the fact that he possessed a firearm during the brief period of flight, would create a substantial risk of serious bodily injury or death to another person. This guideline enhancement simply does not apply to the facts of this case. Mr. Weber therefore respectfully requests that the two-level enhancement under 3C1.2 be removed from the guideline calculation.

### II.     "Offense Behavior Not Part of Relevant Conduct" Should be Stricken

Mr. Weber objects to the inclusion of "Offense Behavior Not Part of Relevant Conduct" at paragraph 30, page 7 of the PSR. This section reads:

> According to the discovery for the instant offense, on February 7, 2017, a confidential informant (CI) with the Federal Bureau of Investigation Safe Streets Task Force made a controlled purchase of one ounce of methamphetamine for $200, from Weber and a redacted individual, in Sacramento. Prior to the purchase, two recorded calls were made to Weber by the CI. The substance tested presumptive positive for methamphetamine and was 30.5 grams, gross weight. On February 14, 2017, a CI purchased four ounces of methamphetamine from Weber, and the same redacted individual, in Sacramento. They met at Flores Bar and Grill in Sacramento and Weber received $750 for the methamphetamine he provided. The methamphetamine was 113.4 grams, gross weight. In the reports, Weber is listed as an Oak Park Blood gang member. There were no charges filed or an arrest.

The information upon which this paragraph relies is found at USAO Bates 266-274, and consists of arrest warrant application forms and a report of investigation. No arrest warrant issued, and it is unclear if an arrest warrant was ever applied for.

This "offense behavior" is comprised of uncharged and unproven conduct related to drug distribution alleged to have occurred more than five years before this unrelated firearm possession case arose. These allegations did not result in any arrest or charges. This "offense behavior" is not relevant conduct under the guidelines, and appears to be a new section of the PSR created especially for the inclusion of this information. The relevance of this information to the PSR in this case is scarce, and the potential harm of including them is significant. Mr. Weber

hopes to participate in rehabilitative programming, to the extent it is available, while at the Bureau of Prisons. Given the high demand for programming in the custodial setting, acceptance into some programs has become highly discretionary. The inclusion of this information could impede Mr. Weber's acceptance into certain programs. Without access to the full range of programming, Mr. Weber's ability to earn time credit will be limited. While these are often the unfortunate but unavoidable consequences of the inclusion of relevant conduct and criminal history (which are necessary and appropriate to include in the PSR), it can be avoided in this instance, as this information is neither necessary nor appropriate, and this category of information, which neither arises from arrest or conviction, is not typically included in the PSRs utilized in this district. It is therefore requested that this section be stricken from the PSR.

### III.   CONCLUSION

For the reasons stated above, and any others that may arise on hearing, Mr. Weber respectfully requests that the Court sustain his objections and correct the PSR to reflect a total offense level of 17 and a resulting guideline range of 37-46 months. Additionally, the Court should strike paragraph 30 as irrelevant and prejudicial.

DATED: August 16, 2022                    Respectfully submitted,

                                          HEATHER E. WILLIAMS
                                          Federal Defender

                                          /s/ *Megan T. Hopkins*
                                          MEGAN T. HOPKINS
                                          Assistant Federal Defender
                                          Counsel for MARCUS LAWRENCE WEBER